OpinioN on Post-Judgment Interventions
HUGHES, District Judge.
In the early 1970s, a group of inmates in the Texas prison system sued the state for violations of their rights to be free from the arbitrary infliction of racially segregated facilities. This suit was supplemental to other suits about the way the prison was being run. The subjects of those suits ranged from unnecessary intrusion into inmate mail to staff-sanctioned inmate violence as a management tool. In 1977, this court enjoined the state permanently from racially segregating inmate housing and other facilities, like jobs and recreation, unless an objective assessment showed that integration for a particular prisoner would pose a high likelihood of danger to him or others.
In the progress of the case toward the permanent decree, classes of parties plaintiff were certified for Hispanic and black inmates, and counsel were appointed for the classes and for intervening defendants who opposed integration. Also, the government of the United States intervened as a plaintiff.
Over the years, a series of hearings were held about compliance and modification. Those orders were expressly made dependent on the results of the classification system imposed in other litigation heard by my distinguished colleague William Wayne Justice of the Eastern District. In the last decade, occasional efforts by the plaintiffs have been necessary to keep the state’s institutions moving toward full, spontaneous compliance with its obligation to be absolutely racially neutral unless a compelling legitimate interest can be shown in an individual case. The court discontinued the state’s duty to make routine reports of in-eell integration. In recent years, the correspondence from individual prisoners has shifted from complaints about segregation to complaints about integration, which is progress of a fashion.
As 1996 begins, Texas prisons confine 126,-000 people. Of those who are compelled to live with a person of a different race, a very small fraction write to the court asserting that, despite a stated preference for same-race cellmates, they are forced to share a cell with an inmate of a different race. Frequently the preference is stated negatively as an animosity. Every sociocultural type complains of every other one.
Bigoted prisoners have generated reams of complaints, including eighty-three requests to modify the desegregation decree. In the last three years alone, prisoners have filed sixty complaints requesting special race classification or re-segregation. Some of these communications are simply letters of protest. Others are couched as motions to intervene or to modify the decree. Motions to modify the decree, to exempt individuals from it, or to intervene by individuals dissatisfied with desegregation will be denied routinely.
A prisoner or two who have not received rulings on their motions have applied to the court of appeals for writs of mandamus. For the benefit of present and future applicants to intervene, no intervention by individual inmates will be allowed. One intervenes in an active case, a case with undecided issues. The present inmates were well represented at public expense in the first phases of this case through the classes and their counsel. No suggestion has been made that the classes were not correctly defined; even if they were the wrong classes, that was determined long ago. The classes had excellent *631 counsel; the state and national governments had their counsel.
The case began in 1972 and was settled in 1977. Nineteen years later, there is no need to address an individual inmate’s bigotry through a modification of the decree. The problems in society that generated the legal contest persist. While great progress has been made in disestablishing the state’s system of pervasive statutory and customary restrictions on people based on race, the system remains reflected in cultural patterns that, in turn, affect the administration of the state’s institutions. The ideals of constitutional order have never been a “machine that would go of itself,” so it remains for this court to see that this ease’s historical decree impinges on the course of state government. James Russell Lowell, The Place of the Independent in Politics, in Political Essays 312 (1888). This court’s potential compulsion is needed, but being in place, it makes the need for actual compulsion less likely than it would be without the decree.
If the state errs in administering the standards required under the decree, the mistake may be serious for the affected inmates, but ordinary errors of application are not a constitutional issue. Systematic misapplication, malicious misapplication, refusal to use the facts available, and deliberate mis-assignment with the intention of injury — these all raise constitutional questions about the regularity of government. The decree in this case excised the systems of conscious segregation and of the casual allowance of segregation. Now the proper course for an inmate who believes that he was hurt by a violation of the standards required of the state is to sue the state for compensation through the responsible individuals. Procedurally, that action will be wholly independent from this case. The existence of class-wide injunctive relief in this case forecloses that relief to individuals.
A second route for help is for the inmate to report the violations to the Justice Department, class counsel, and the Texas attorney general. Although the notice of violation may be of little direct personal benefit, it is likely to help with the problem as a whole.
The court is wary of being seen to test the resolve of inmates who announce that their hate will make them violently disposed to other races if they are locked together. No amount of violence, large or small, to prove one’s eligibility for a single-race cell will be rewarded by the state or by this court. An inmate who proves that he is both a bigot and violent will face consequences much worse than an undesirable cellmate.